IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TUXIS TECHNOLOGIES, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | The Honorable Richard G. Andrews |
| -vs.- ) | |
| ) | Case No. 1:13-cv-01771-RGA |
| AMAZON.COM, INC., ) | |
| ) | |
| Defendant. ) | |

**OPENING BRIEF OF
AMAZON.COM, INC. IN SUPPORT OF ITS
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

*Of Counsel*:

William H. Baumgartner, Jr.
wbaumgartner@sidley.com
SIDLEY AUSTIN, LLP
One South Dearborn Street
Chicago, IL 60603
(302) 853-7000

Joseph R. Guerra
jguerra@sidley.com
Michael R. Franzinger
mfranzinger@sidley.com
Kyle T. Deighan
kdeighan@sidley.com
SIDLEY AUSTIN, LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

January 23, 2014

Steven J. Balick (#2114)
sbalick@ashby-geddes.com
Tiffany Geyer Lydon (#3950)
tlydon@ashby-geddes.com
Andrew C. Mayo (#5207)
amayo@ashby-geddes.com
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

Counsel for Defendant
AMAZON.COM, INC.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

NATURE AND STATE OF THE PROCEEDINGS ...................................................... 1

SUMMARY OF THE ARGUMENT ............................................................................. 1

STATEMENT OF FACTS ............................................................................................. 2

LEGAL STANDARD .................................................................................................... 6

ARGUMENT .................................................................................................................. 7

     I.     THE '513 PATENT'S CLAIMS ARE NOT PATENT-ELIGIBLE
          UNDER 35 U.S.C. § 101. ........................................................................... 7

          A.     The Concept Of Remote Cross-Selling Is No More Patent-
               Eligible Than The Price Protection Method Rejected In
               *Bilski*. ............................................................................................ 9

          B.     Nothing In The Claims Of The Tuxis Patent Renders The
               Abstract Idea Of Cross-Selling Patentable. .................................. 11

          C.     The Machine-Or-Transformation Test Compels The Same
               Result. .......................................................................................... 15

     II.     THE PATENT'S WRITTEN DESCRIPTION DOES NOT SUPPORT
          ITS SWEEPINGLY BROAD CLAIMS. .................................................. 15

CONCLUSION ............................................................................................................. 20

# TABLE OF AUTHORITIES

*Cases:*                                                                 *Page(s):*

*Ariad Pharmaceuticals, Inc, et al. v. Eli Lilly and Co.,*
    598 F.3d 1336 (Fed. Cir. 2010) (*en banc*) .......................................................15, 19

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.,*
    521 F.3d 1328 (Fed. Cir. 2008)..............................................................................17

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.),*
    687 F.3d 1266 (Fed. Cir. 2012)..............................................................................10

*Bilski v. Kappos,*
    130 S. Ct. 3218 (2010) ................................................................................ *passim*

*BuySAFE, Inc. v. Google, Inc.,*
    No. 11-1282-LPS, 2013 WL 3972261 (D. Del. July 29, 2013).........................7, 10

*Clear with Computers, LLC v. Dick's Sporting Goods, Inc.,*
    No. 12-cv-00674-LED (E.D. Tex. Jan. 21, 2014)....................................................6

*CLS Bank Int'l. v. Alice Corp. Pty. Ltd.,*
    717 F.3d 1269 (Fed. Cir. 2013); *cert. granted*, 187 L. Ed. 2d 590 (U.S. Dec. 6, 2013)..........11

*CyberSource Corp. v. Retail Decisions, Inc.,*
    654 F.3d 1366 (Fed. Cir. 2011)....................................................................7, 10, 13

*Dealertrack, Inc. v. Huber,*
    674 F.3d 1315 (Fed. Cir. 2012)..............................................................7, 10, 13, 15

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,*
    535 U.S. 722 (2000)..............................................................................................15

*Fort Properties, Inc. v. Am. Master Lease LLC,*
    671 F.3d 1317 (Fed. Cir. 2012)........................................................................10, 13

*Fuller v. Yentzer,*
    94 U.S. 288 (1876)................................................................................................16

*Funk Brothers Seed Co. v. Kalo Inoculant Co.,*
    333 U.S. 127 (1948)................................................................................................9

*General Elec. Co. v. Wabash Appliance Corp.,*
    304 U.S. 364 (1938)..............................................................................................16

*Glory Licensing LLC v. Toys "R" Us, Inc.,*
    No. 09-4252, 2011 WL 1870591 (D.N.J. May 16, 2011) ......................................................6

*Gottschalk v. Benson,*
    409 U.S. 63 (1972) ..............................................................................................................12

*Halliburton Oil Well Cementing Co. v. Walker,*
    329 U.S. 1 (1946) ................................................................................................................16

*Holland Furniture Co. v. Perkins Glue Co.,*
    277 U.S. 245 (1928) ............................................................................................................16

*Ibormeith IP LLC v. Mercedes-Benz, USA,*
    732 F.3d 1376 (Fed. Cir. 2013) ...........................................................................................20

*In re Bilski,*
    545 F.3d 943 (Fed. Cir. 2008) (en banc) .............................................................................15

*In re Comiskey,*
    554 F.3d 967 (Fed. Cir. 2009) .............................................................................................10

*In re Ferguson,*
    558 F.3d 1359 (Fed. Cir. 2009) ...........................................................................................10

*In re Maucorps,*
    609 F.2d 481 (C.C.P.A. 1979) ............................................................................................10

*In re Schrader,*
    22 F.3d 290 (Fed. Cir. 1994) ...............................................................................................10

*Katz v. Am. Airlines, Inc. (In re Katz Interactive Call Processing Patent Litig.),*
    639 F.3d 1303, 1309 (Fed. Cir. 2011) ..................................................................................2

*M2M Solutions LLC v. Sierra Wireless Am.,*
    2013 WL 5981336 (D. Del. Nov. 12, 2013) .........................................................................7

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
    132 S. Ct. 1289 (2012) ................................................................................................ *passim*

*Noah Systems, Inc. v. Intuit Inc.,*
    675 F.3d 1302 (Fed. Cir. 2012) ...........................................................................................17

*O'Reilly v. Morse,*
    56 U.S. (15 How.) 62 (1853) ................................................................................................8

*OIP Techs., Inc., v. Amazon.com, Inc.,*
    No. C-12-1233, 2012 WL 3985118 (N.D. Cal. Sep. 11, 2012) .............................................6

*Parker v. Flook*,
  437 U.S. 584 (1978)..................................................................................................8

*Regents of the Univ. of California v. Eli Lilly and Company*,
  119 F.3d 1559 (Fed. Cir. 1997)..............................................................................20

*Reiffin v. Microsoft Corp.*,
  214 F.3d 1342 (Fed. Cir. 2000)..............................................................................16

*Research Corp. Tech., Inc. v. Microsoft Corp.*,
  627 F.3d 859 (Fed. Cir. 2010)................................................................................11

*Sinclair-Allison, Inc. v. Fifth Avenue Physicians Servs., LLC*,
  No. CIV-12-360, 2012 WL 6629561 (W.D. Okla. Dec. 19, 2012) ..........................6

*SiRF Tech., Inc. v. ITC*,
  601 F.3d 1319 (Fed. Cir. 2010)..............................................................................11

*UbiComm, LLC v. Zappos IP, Inc.*,
  No. 13-1029-RGA, 2013 WL 6019203 (D. Del. Nov. 13, 2013) ......................7, 10

*Ultramercial, Inc. v. Hulu, LLC*,
  722 F.3d 1335 (Fed. Cir. 2013)..............................................................................11

*Uniloc USA, Inc. v. Rackspace Hosting, Inc., et al.*,
  No. 12-cv-00375 (E.D. Tex. March 27, 2013)..........................................................6

*University of Rochester v. G.D. Searle & Co., Inc.*,
  358 F.3d 916 (Fed. Cir. 2004)..................................................................................7

*West Interactive Corp. v. First Data Resources, Inc.*,
  972 F.2d 1295 (Fed. Cir. 1992)................................................................................2

Statutes and Rules:

35 U.S.C. § 101 ................................................................................................... *passim*

35 U.S.C. § 112(f)....................................................................................................17

F.R.C.P. 12(b)(6) ......................................................................................................1

Miscellaneous:

Landes, W. & R. Posner, *The Economic Structure of Intellectual Property Law* (2003)………...8

Rai, A., *et al.*, U.S. Dep't of Commerce, *Patent Reform: Unleashing Innovation,*
  *Promoting Economic Growth & Producing High-Paying Jobs* (Apr. 13, 2010)………...8

## NATURE AND STATE OF THE PROCEEDINGS

Tuxis Technologies, LLC ("Tuxis") accuses Amazon.com, Inc. ("Amazon") of infringing a United States patent that purports to own the basic economic concept of "cross-selling," *i.e.*, offering customers who seek to purchase one thing the opportunity to purchase something else. (D.I. 1, Complaint, Ex. A.)  The Tuxis patent is, by any measure, invalid on its face according to an unbroken chain of controlling Supreme Court and Federal Circuit precedent and recent decisions of this Court.  For this reason, and for the reasons stated more fully below, Amazon moves under Rule 12(b)(6) to dismiss this action for failure to state a claim for which relief can be granted.

## SUMMARY OF THE ARGUMENT

Tuxis's patent is invalid because it violates two closely-related cornerstone rules of patent law:  (1) the rule against owning fundamental concepts that should never be removed from the public domain; and (2) the rule against owning naked results independent of any particular way of achieving them.  Both rules protect future innovation—the first ensures that patents do not preempt future use of fundamental tools of scientific (or in this case economic) thought, while the second ensures that patents do not foreclose ways of achieving results that a patentee has not actually invented.  The Tuxis patent facially violates both of these rules.

1.      The Tuxis patent violates the rule against owning fundamental principles because it claims to own the very idea of cross-selling—provided the idea is implemented using a generic computer network.  The patent is utterly devoid of any technology beyond the naked recitation of generic computing devices operating in generic and inherent ways.  The very concept at issue is neither technical nor scientific, but rather a fundamental tool of marketing and sales.  And yet the law cannot be clearer—engrafting generic computing devices, operating in generic and inherent

ways, can never transmogrify a fundamental principle of sales and marketing into a patentable invention.

2.     The Tuxis patent also violates the rule against owning naked results independent of a particular way of achieving them.  The patent recites a list of functions to be performed by a network of generic computing devices that somehow "intelligently" identifies goods and services to cross-sell to specific customers.  The patent is agnostic about the *infinite* number of ways that generic computers might achieve such a complex result even as the patent fails to disclose a *single* way of achieving it.  There is no algorithm.  There is no system logic.  There are no programming steps.  There are no instructions.  There can be no invention under settled patent law.

## STATEMENT OF FACTS

Tuxis[1] alleges infringement of U.S. Patent No. 6,055,513 ("the '513 patent").  (D.I. 1, Complaint, ¶ 10.)  The '513 patent, entitled "Methods and Apparatus for Intelligent Selection of Goods and Services in Telephonic and Electronic Commerce," claims to have invented the basic economic concept of cross-selling[2] in "remote commerce," *i.e.*, commerce conducted over the telephone and now stretched to include the internet.  The patent admits that cross-selling was well known, including the basic idea to offer a customer items "directly related to the product for which contact was made" (col. 1, ll. 45-50) and "targeted marketing" based on knowledge about

---

[1] Tuxis was not the original assignee of the patent (*see* D.I. 1, Complaint, Ex. A at 1 (assignee is Telebuyer, LLC)), and does not allege that it provides any products or services.  The named inventors include Ronald A. Katz, who has a lengthy history of licensing and litigating business method patents related to telemarketing and call centers.  *See, e.g., Katz v. Am. Airlines, Inc.* (*In re Katz Interactive Call Processing Patent Litig.*), 639 F.3d 1303, 1309 (Fed. Cir. 2011); *West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295, 1298-1300 (Fed. Cir. 1992) (Lourie, J., dissenting).

[2] The patent uses the colloquial term "upsell," but defines it to mean the basic economic idea of cross-selling.  (*See* col. 13, ll. 38-41 ("The term 'upsell' means an offer or provision of a good or service which is selected for offer to the customer and differs from the good or service for which the primary contact was made.").)

the customer (col. 2, ll. 55-67).   But these earlier techniques were flawed, according to the patent, because none provided for "the *intelligent*, automated provision of goods and services in the telephonic and electronic commerce areas."   (Col. 8, ll. 26-30 (emphases added).)[3]   The patent, therefore, purports to have invented a new method and system for "real time" cross-selling "particularly adapted to the *intelligent* selection and proffer of products, services or information to a user or customer."   (*Id.*, ll. 34-38 (emphasis added); *see also* col. 12, ll. 57-59.)

The '513 patent does not purport to invent any particular hardware or software, much less any new configuration of hardware and software, to carry out this "intelligent" and "automated" method.   Instead, the patent claims to own all current and future systems, including all current and future software instructions, that can perform the *function* of automating the steps inherent in the basic concept of cross-selling.   The patent defines the invention solely by the *functions* it performs—that is, by what it *does* and not by what it *is:*

> [T]he *understanding* of the *inventions* herein should be *based upon the functionality*, as implemented by selected structures, though not necessarily upon which particular unit of structure in which the functionality resides.

(Col. 15, ll. 7-11 (emphasis added).)

> [A]ny type of *human/machine interface* consistent with *achieving the goals and functionalities* of the instant inventions may be utilized.

(Col. 20, ll. 4-6 (emphasis added).)

---

[3] *See, e.g.*, col. 1, ll. 50-52 (in telemarketing, "the correlation between the products offered is predefined, and does not vary depending on the caller"); col. 2, ll. 30-33 (in "push systems," the "pushed good or service is provided in a non-targeted manner . . . irrespective of differences between" customers); col. 6, ll. 8-16 ("by failing to intelligently analyze the available data," coupon dispensing systems "may generate proposed coupon[s] which are precisely wrong for a customer," such as offering coupons for meat to a vegetarian); col. 7, ll. 63-65 (financial website "does not provide specific recommendations or optimize the results").

> [T]he underlying aspects of this invention . . . encompass the *func-*
> *tionalities and structures to achieve them*, as those particular im-
> plementations to achieve them are *modified over time*.

(Col. 20, ll. 19-22 (emphasis added).)

The specification and diagrams describe the "intelligent" "upsell determination" in equal-ly functional terms.  The "Upsell System" is a "determining system."  (Fig. 3, 5.)  Order entry data is "compare[d]" with "one or more database(s) to determine 'upsell' data," Figs. 1, 4; data is somehow "analyze[d]" and provided to a telemarketer, (Fig. 2), or serve as inputs for a "product selection/upsell determination," (Fig. 6).  No diagram, flow chart, system logic, or software in-structions are provided that disclose a *way* to analyze data to intelligently determine an "upsell."

Similarly, the specification states that the "upsell system" "typically includes a determin-ing or type analysis system or unit 110 which serves to receive the various inputs for the deter-mining unit and to generate outputs relating to possible upsells."  (Col. 16, ll. 64-67.)  These in-puts can take virtually any form, including "credit information, personal information, demo-graphic information . . . or other form of input data."  (Col. 18, ll. 2-5.)  Any or all of this data can then be "used by the system to generate the upsells."  (*Id.*; *see also* col. 19, ll. 40-54 ("vari-ous inputs for use by the analysis system are collected, and subsequently analyzed. . . .  Upon completion of the analysis at analysis block 144, the output of the analysis block 144 is provided to the user"); col. 10, ll. 46-48.)  The upsell determination process "includes the identification or selection of a set or subset of all/ possible goods or services available for offer, with the goal of optimizing the likelihood of upsell."  (Col. 23, ll. 67 – col. 24, ll. 2.)

But the specification discloses no algorithm, instructions, logic, or software steps that a generic computer can use to analyze data to "intelligently" select items and "optimiz[e] the like-lihood of" an upsell.  Instead, the specification states only that the upsell generator system is "a special purpose computer or a general purpose computer program," and that the program "may

be implemented in a linear programmed fashion, or may use other decisional bases, such as expert systems, fuzzy logic, neural networks, adaptive systems, or other decisional systems known to the art, and which effectuate the desired functionalities of the inventions." (Col. 20, ll. 23-32.)

In lieu of any particular way of achieving these results, the patent offers only results that might be achieved. For example, when a customer "has previously purchased a portion of a set, the completion of the set may be a goal," (col. 24, ll. 25-27); when a customer "owns a particular model of computer, that information may be utilized in the selection of a proffer, such as in the offer of increased computer memory, a new version of a software application or the like," (col. 11, ll. 3-7); and if a customer has "purchased clothing for use in mountain biking," that customer "may be more susceptible to an offer for mountain bike related goods or services," (col. 24, ll. 21-24). The patent is entirely *agnostic* about how to perform any of these functions, much less how to derive a set of rules, protocols, instructions, or system logic for effecting an intelligent upsell (even as the patent cautions that not all upsells work, (*see* col. 6, ll. 8-16)).

The patent's claims are no more specific. Each independent claim recites a "system" and an "electronic communications device," and independent claims 255 and 259 specify that the electronic communications device "include[s] a computer." None, however, says anything of substance about new or special hardware or software to accomplish the claimed steps. Most recite the step of obtaining "transaction data," including information about a customer's identity and the good or service that is the subject of a primary transaction; using the customer identity information to obtain at least one "second data element" about the customer; and using some aspect(s) of the "transaction data" and "the second data element" to (somehow) "determin[e]" or "select[]" an item for "upsell" or information to provide to the customer. (*See* Cls. 1, 94, 159, 198, 228, 255, 259; *see also* Cl. 260 (transaction data need not be used to determine upsell item);

Cl. 263 (transaction data includes data for determining customer identity).)  Independent claims

210 and 221 recite "selecting a second potential purchase transaction for presentation to the user"

without mentioning the collection, much less the intelligent use, of any data.  None expresses any

preference about the *way* data are to be analyzed or an effective upsell item is to be determined.

The dependent claims are no better.  Most recite types of data that could be used (*e.g.*,

social security numbers, e-mail addresses) or steps inherent in selling things (*e.g.*, shipping,

tracking, billing, updating inventory).  The high-water mark for technical specificity is the naked

recitation of a host of conventional computing technologies, including "the internet" (cl. 19), "a

local database" (cl. 36), and "a remote database" (cl. 39).  None adds any meaningful technolog-

ical content to the independent claims from which they depend.

## LEGAL STANDARD

"Low-quality-patents—that is, patents that show no invention or are … overly broad, or

unclear in the inventive territory that they cover—[] hinder innovation.  This is because, although

patents may be low quality, they can nonetheless be profitably asserted against genuine innova-

tors."  U.S. DEP'T OF COMMERCE, PATENT REFORM: UNLEASHING INNOVATION, PROMOTING

ECONOMIC GROWTH & PRODUCING HIGH-PAYING JOBS (Apr. 13, 2010), attached as Exhibit A, at

5.  Thus, courts can and do dispense with facially invalid patents at the pleading stage because

such patents should be "exposed at the point of minimum expenditure of time and money by the

parties and the court."  *Uniloc USA, Inc. v. Rackspace Hosting, Inc., et al.*, No. 12-cv-00375 at 3

(E.D. Tex. March 27, 2013) (Dkt. No. 38) (citations omitted), attached as Exhibit B.[4]

---

[4] *See* also *Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*, No. 12-cv-00674-LED, slip op. at 5-14 (E.D. Tex. Jan. 21, 2014) (Dkt. No. 116), attached as Exhibit C; *Sinclair-Allison, Inc. v. Fifth Avenue Physicians Servs., LLC*,  No. CIV-12-360, 2012 WL 6629561 (W.D. Okla. Dec. 19, 2012); *OIP Techs., Inc., v. Amazon.com, Inc.*, No. C-12-1233, 2012 WL 3985118 (N.D. Cal. Sep. 11, 2012) (Dkt. No. 50); *Glory Licensing LLC v. Toys "R" Us, Inc.*, No. 09-4252, 2011 WL 1870591 (D.N.J. May 16, 2011).

Whether a claim recites patent-eligible subject matter is a question of law, *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011), that may be resolved on a motion to dismiss. Dismissal is appropriate when there is clear and convincing evidence of ineligibility regardless of any plausible claim construction raised by the plaintiff. *UbiComm, LLC v. Zappos IP, Inc.*, No. 13-1029-RGA, 2013 WL 6019203, at *1 (D. Del. Nov. 13, 2013) (granting motion to dismiss for lack of patentable subject matter); *see also BuySAFE, Inc. v. Google, Inc.*, No. 11-1282-LPS, 2013 WL 3972261, at *1 (D. Del. July 29, 2013) (granting judgment on the pleadings for lack of patentable subject matter). Courts can and do invalidate patents on § 101 grounds without conducting a formal claim construction. *See, e.g., Bilski v. Kappos*, 130 S. Ct. 3218, 3231 (2010).[5] And while the adequacy of a patent's written description is a question of fact, "a patent can be held invalid for failure to meet the written description requirement, based solely on the language of the patent specification." *University of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 927 (Fed. Cir. 2004). Similarly, a patent can be held indefinite without reference to material outside the pleadings. *See, e.g., M2M Solutions LLC v. Sierra Wireless Am.*, 2013 WL 5981336, at *6-*7 (D. Del. Nov. 12, 2013).

## ARGUMENT

### I.     THE '513 PATENT'S CLAIMS ARE NOT PATENT-ELIGIBLE UNDER 35 U.S.C. § 101.

Section 101 of the Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful im-

---

[5] The '513 patent claim terms need not be construed to decide this motion, because the claims are patent-ineligible under any plausible reading. If Tuxis disagrees, it should state its proposed constructions and explain how they could matter. *See UbiComm*, 2013 WL 6019203, at *1-*3.

provement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." Two overriding legal principles control the application of § 101 to this case.

First, § 101 "contains an important implicit exception" for "laws of nature, natural phenomena, and abstract ideas." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012) (quotation and citation omitted). Such principles are not patentable because "they are the basic tools of scientific and technological work," which are "free to all men and reserved exclusively to none." *Id.* (internal quotation marks and citations omitted). "[M]onopolization of those tools through the grant of a patent" would yield no social benefit while imposing "'enormous transaction costs . . . on would-be users [of those truths],'" and "inhibit[ing] future innovation premised upon them." *Id.* at 1293, 1301-02 (quoting W. Landes & R. Posner, *The Economic Structure of Intellectual Property Law* 305-06 (2003)). Accordingly, subject matter falling within this exception is not patent-eligible as a matter of law. *Id.* at 1293.

Second, "to transform an unpatentable [abstract idea] into a patent-eligible *application* of such [an idea], one must do more than simply state the [idea] while adding the words 'apply it.'" *Id.* at 1294. Simply taking an abstract idea and adding steps—or breaking it into inherent steps—that involve "well-understood," "routine," or "conventional" activity contributes nothing inventive to an otherwise abstract idea, leaving only the abstract idea as the subject matter of the claims. *Id.* at 1294, 1299-1300; *see also Parker v. Flook*, 437 U.S. 584, 590 (1978). Without meaningful limits to an abstract idea, a patent effectively preempts the idea itself and claims exclusive ownership over a range of inventions (including future applications) that the patentee never conceived, much less contributed to the state of the art. *Bilski*, 130 S. Ct. at 3231; *O'Reilly v. Morse*, 56 U.S. (15 How.) 62, 112-14 (1853). It is thus settled that merely limiting the appli-

cation of an abstract idea to a particular "field of use or adding token postsolution components" does not render the idea a patent-eligible invention. *Bilski*, 130 S. Ct. at 3231.

> ### A.   The Concept Of Remote Cross-Selling Is No More Patent-Eligible Than The Price Protection Method Rejected In *Bilski.*

The '513 patent's claims are directed to the basic idea of offering something to a customer based on his or her interest in something else. That idea has been a cornerstone of commercial activity since time immemorial. It is undoubtedly one of the "'basic tools'" in the "'storehouse of knowledge'" that are "'free to all men and reserved exclusively to none.'" *Bilski*, 130 S. Ct. at 3225, 3253 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972), and *Funk Brothers Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948)).

*Bilski* leaves no room for doubt about that conclusion. The patent application in *Bilski* attempted to claim "how buyers and sellers of commodities in the energy market can protect, or hedge, against the risk of price changes." *Bilski*, 130 S. Ct. at 3223. Rather than adding any meaningful limitations or allegedly new machines, the claims in *Bilski* simply deconstructed the basic economic concept of price protection into a series of inherent steps, including (1) initiating a series of financial transactions at a fixed rate based on historical averages, where the fixed rate corresponds to a risk position of consumers, (2) identifying market participants having a counter-risk position to those consumers, and (3) initiating a series of financial transactions between the consumers and market participants to balance the risk. *Id.* at 3223-24. The Court held that allowing this "fundamental economic practice" to be patented "would effectively grant a monopoly over an abstract idea." *Id.* at 3231.

The method of cross-selling claimed in the '513 patent is no less abstract than the method of price protection rejected in *Bilski*. Like "the basic concept of hedging," the basic concept of cross-selling "'is a fundamental economic practice long prevalent in our system of commerce.'"

*Id.* (citation omitted).  As in *Bilski's* application, the claims of the '513 patent simply deconstruct the abstract concept of cross-selling into a series of constituent and inherent steps according to which a customer makes contact with a merchant for the purpose of one purchase transaction, and the merchant offers a second purchase transaction.  (*See, e.g.*, cl. 210.)  This fundamental sales technique is at least as "fundamental" as the practice of hedging.

Federal Circuit precedent in the wake of *Bilski* compels the same conclusion.  For example, in *CyberSource*, the Federal Circuit invalidated a patent directed to the far less abstract concept of detecting fraud in credit card transactions, because it claimed "only the general approach of obtaining information about credit card transactions utilizing an Internet address and then using that information in some undefined manner to determine if the credit card transaction is valid."  654 F.3d at 1374, 1376-77.  In *Dealertrack*, the court invalidated claims reciting the basic concept of processing information through an electronic loan clearinghouse, concluding that the claims were just as abstract as the hedging concept in *Bilski*.  674 F.3d at 1332-35.  And the Federal Circuit affirmed a finding that claims directed to the idea of a tax-deferred exchange of property were similarly not patentable under § 101.  *Fort Properties, Inc. v. Am. Master Lease LLC*, 671 F.3d 1317, 1322-24 (Fed. Cir. 2012); *see also, e.g.*, *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1269-72 (Fed. Cir. 2012) (invalidating claims for managing life insurance policies through certain calculations).[6]

---

[6] *See also, e.g.*, *In re Ferguson*, 558 F.3d 1359, 1364 (Fed. Cir. 2009) (methods "directed to organizing business or legal relationships" in a sales force or marketing company were unpatentable "abstractions"); *In re Comiskey*, 554 F.3d 967, 978, 981 (Fed. Cir. 2009) (method of "mandatory arbitration resolution" unpatentable because it merely "manipulate[s] abstract ideas" (quotation and citation omitted)); *In re Schrader*, 22 F.3d 290, 292, 293 (Fed. Cir. 1994) (method of "conducting auctions" to maximize total sales using "well-known mathematical optimization procedures" unpatentable); *In re Maucorps*, 609 F.2d 481, 482, 486 (C.C.P.A. 1979) (method of "optimizing the organization of sales representatives in a business" unpatentable).

The decisions of this District are in accord. *See UbiComm*, 2013 WL 6019203, at *5-7 (invalidating claims for the abstract idea of conditional action by a computer); *BuySAFE*, 2013 WL 3972261, at *4-5 (invalidating claims for a computerized process of underwriting commercial transactions by a third party to guarantee performance).[7]

These authorities thus make clear that the abstract idea of cross-selling in remote commerce cannot possibly be owned by a single entity as private property.

### B.    Nothing In The Claims Of The Tuxis Patent Renders The Abstract Idea Of Cross-Selling Patentable.

The rule of *Bilski* cannot be circumvented by attempting to limit an abstract idea to a particular field or technological environment, by breaking the concept into a series of common-sense steps, or by engrafting insignificant limitations onto the concept. Such inconsequential and cosmetic steps do not change the fact that a patent is drawn to an abstract idea.

An unpatentable abstract idea does not become patentable simply by "limiting" it to a particular field or technological environment or by adding insignificant steps—lest "patent eligibility 'depend simply on the draftsman's art.'" *Mayo*, 132 S. Ct. at 1294 (quoting *Flook,* 437 U.S. at 593). In *Mayo,* the Court held that a medical diagnostic method that consisted of admin-

---

[7] The few post-Bilski appellate decisions rejecting § 101 challenges in the computer or business method context are distinguishable. In *SiRF Tech., Inc. v. ITC*, 601 F.3d 1319 (Fed. Cir. 2010), the Federal Circuit declined to invalidate claims that "explicitly require[d] the use of a particular machine (a GPS receiver) and could not be performed without the use of such a receiver." *Id.* at 1333. In *Research Corp. Tech., Inc. v. Microsoft Corp.*, 627 F.3d 859 (Fed. Cir. 2010), the Federal Circuit upheld the eligibility of claims drawn to software that acted on digital images, "rendering a halftone image of a digital image by comparing, pixel by pixel, the digital image against a blue noise mask." *Id.* at 868. In *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335 (Fed. Cir. 2013), the court found patent-eligible a method for monetizing copyrighted products because, inter alia, the patent claimed a "practical application" of a general concept that entailed "eleven separate and specific steps with many limitations and sub-steps in each category." *Id.* at 1353-54 (cert. petition pending). An initial ruling of patent eligibility in *CLS Bank Int'l. v. Alice Corp. Pty. Ltd.* was vacated by the court acting en banc, and the case is now before the Supreme Court. *See* 717 F.3d 1269 (Fed. Cir. 2013); *cert. granted sub nom. Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 734 (Dec. 6, 2013).

istering a drug for a certain class of diseases and measuring the resulting metabolite levels was unpatentable on the ground that the claims were nothing more than a series of "conventional," "routine," or "well-understood" limitations appended to an otherwise unpatentable principle (*i.e.*, the natural correlation between patient metabolite levels and drug efficacy). *Id.* at 1294, 1298.[8] In reaching that conclusion, the Court drew upon its prior precedents, each of which compels the same result in this case.

For example, the idea of hedging did not become patentable by limiting it "to use in commodities and energy markets" and adding "'well-known random analysis techniques.'" *Mayo*, 132 S. Ct. at 1300-01 (quoting *Bilski*, 130 S. Ct. at 3231).  Likewise, the idea of using a formula to compute an updated alarm limit did not become patentable merely by confining it to the petrochemical field and adding "'post-solution activity' that is purely 'conventional or obvious.'"  *Id*. at 1299 (quoting *Flook*, 437 U.S. at 589-90).  And the idea of converting binary-coded decimal numbers to pure binary did not become patentable "simply [by] implementing [it] on a physical machine, namely a computer."  *Id*. at 1301 (discussing *Benson*).  The *Mayo* Court specifically reaffirmed *Benson*'s holding that simply implementing an unpatentable idea on a computer is "not a patentable application of that principle."  *Id.*

Here, the generic computing devices do not meaningfully limit the claims of the '513 patent for the same reasons.  Rather than inventing a new computing devices or a new way of programming such devices, the '513 patent's specification boasts that the invention can be implemented using *any* of "the functionalities and structures to achieve" it.  (Col. 20, ll. 20-21.)

---

[8] The patent in *Mayo* involved a "law of nature," but the Court made clear that its treatment of "laws of nature" as an "implicit exception" to § 101 applied to "natural phenomena" and "abstract ideas"—concepts that are equally unpatentable.  132 S. Ct. at 1293, 1297-98, 1300-02.

Moreover, even where a computer provides a practical benefit, it does not impart patent eligibility.  Thus, the fact that a computer might be "an obvious mechanism for permitting a solution to be achieved more quickly—*i.e.*, through the utilization of a computer for performing calculations"—did not make an otherwise abstract claim patent-eligible, because the computer does not "impose a meaningful limit on the scope of [the] claim."  *Dealertrack*, 674 F.3d at 1333 (quotation and citation omitted); *see also Fort Properties*, 671 F.3d at 1322, 1324 (a claim element requiring use of "a computer to 'generate a plurality of deedshares'" did not render abstract idea patentable, because the "computer limitation [was] simply insignificant post-solution activity").  So too here, use of a computer does not impart patentability to the '513 patent's claim to "real time" cross-selling in remote commerce.

Similarly, data-gathering steps do not transform an abstract idea into a patent-eligible invention.  Such steps are "well-understood, routine, [and] conventional," and therefore do not make the claim patentable.  *Mayo*, 132 S. Ct. at 1299; *see also CyberSource*, 654 F.3d at 1370 ("mere data-gathering steps" cannot make an otherwise unpatentable claim patentable (quotation and citation omitted)).  The data-gathering steps in the '513 patent, such as "obtaining primary transaction data with respect to the primary transaction, including the identity of the prospective customer and of the good or service for purchase in the primary transaction" and "utilizing the identity of the prospective customer to obtain at least a second data element relating to the user," cl. 1, add no meaningful limitation because they are inherent in any effort to base a cross-sale on some insight about the customer.  Here, as in *CyberSource*, simply reciting the steps of "obtaining information about [a] transaction[]," obtaining an additional piece of information, "and then using that information in some undefined manner to" determine something, 654 F.3d at 1374,

1376—*e.g.*, the choice of an upsell item or the validity of a credit card transaction—does not impart patentability to an abstract idea.

Nor do any of the other "token postsolution components" make the claims patent eligible. *Bilski*, 130 S. Ct. at 3231. The vast majority of the '513 patent's dependent claims do not add *any* steps or structures, but merely list conventional and often inherent examples of data types, data sources, and communication media. *See* Exhibit D. What little additional activity is recited in the dependent claims is entirely of the insignificant extra-solution variety. *See Mayo*, 132 S. Ct. at 1298-1300; *Bilski*, 130 S. Ct. at 3231. For example, claim 52 provides for the selection of "more than one good or service item" to offer to the consumer. Claims 56 and 58 limit the method to the scenarios in which one or both transactions are "consummated." Claims 59-64 specify the way the "upsell" item is displayed. Claims 73-78 recite ordinary ways of obtaining user data (*e.g.*, "in response to specific questions"). Claims 88-92 recite standard steps such as "shipping," "tracking," "billing," and "inventory" updating.[9] These elementary steps are inconsequential because "simply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable." *Mayo*, 132 S. Ct. at 1300.

In short, the abstract idea of cross-selling does not become patentable simply by purportedly "limiting" it to an "electronic communications" environment, by deconstructing it  into discrete or inherent steps, or by engrafting insignificant, conventional, or well-known steps. Any additional limitations present in the '513 patent do not provide an "inventive concept" or make the claims "significantly more" than the abstract economic principle itself. *Id.* at 1294.

---

[9] Exhibit D hereto contains a chart expanding this analysis to the remaining claims.

### C.   The Machine-Or-Transformation Test Compels The Same Result.

The '513 patent also fails the "machine or transformation test." That test is satisfied only if the claimed process (1) "is tied to a particular machine or apparatus," or (2) "transforms a particular article into a different state or thing." *Bilski*, 130 S. Ct. at 3225 (quotation and citation omitted). Although the machine-or-transformation test is "not the sole test" for patentability, the Supreme Court has admonished that it nevertheless is "a useful and important clue, an investigative tool, for determining whether some claimed inventions are [patent-eligible] processes under § 101." *Id.* at 3227. The claims here fail both prongs of the test.

The claims of the '513 patent are not tied to "a particular machine." It is settled that "[s]imply adding a 'computer aided' limitation to a claim" does not make it tied to a "particular machine." *Dealertrack*, 674 F.3d at 1333-34. Neither the specification nor the claims provides any detail regarding what specific "electronic communications device," "system," "database," or "computer" should be used to implement the claimed method. To the contrary, the '513 patent boasts that the invention can be implemented using *any* "type of human/machine interface" (col. 20, l. 4), "intermediate or terminal node or contact point" (col. 20, ll. 14-15), or "a special purpose computer or a general purpose computer program" (col. 20, ll. 24-26).

Nor do the claims satisfy the "transformation" prong. Simply sending and receiving "electronic messages" over a "network" is not a transformation of "physical objects." *In re Bilski*, 545 F.3d 943, 963 (Fed. Cir. 2008) (en banc). Nor are such messages "representative[s] of physical objects." *Id.*

## II.   THE PATENT'S WRITTEN DESCRIPTION DOES NOT SUPPORT ITS SWEEPINGLY BROAD CLAIMS.

The '513 patent is invalid for yet another reason: even if it claimed patentable subject matter—and it plainly does not—the specification fails to "demonstrate that the applicant actual-

ly invented—was in possession of—the claimed subject matter." *Ariad Pharmaceuticals, Inc, et al. v. Eli Lilly and Co.*, 598 F.3d 1336, 1349 (Fed. Cir. 2010) (*en banc*); *see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 736 (2000) ("What is claimed by the patent application must be the same as what is disclosed in the specification; otherwise the patent should not issue."). The '513 patent thus violates the *quid pro quo* embodied in a patent, because the intellectual property it purports to fence off from public use vastly "overreach[es] the scope of the inventor's contribution . . . as described in the patent specification." *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345-46 (Fed. Cir. 2000).

It has long been the rule that a patent "will not be sustained if the claim is for a result," *Fuller v. Yentzer*, 94 U.S. 288, 288 (1876), because a *result*, without more, is not an *invention*. Rather, an invention "consists in the means or apparatus *by which the result is obtained*." *Id.* (emphasis added). Patents that seek to claim a "result or function" are impermissible because they effectively seek to "extend the monopoly beyond the invention," and thereby "discourage rather than promote invention." *Holland Furniture Co. v. Perkins Glue Co.*, 277 U.S. 245, 257-58 (1928). *See also General Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 371 (1938) ("the vice of a functional claim" is that it "extend[s] the monopoly beyond the invention" by using "conveniently functional language at the exact point of novelty") (internal quotation marks and citation omitted). Claims that describe an invention only "in terms of what it will do" chill future innovation, because "inventive genius may evolve many more" and different ways to "perform that function," yet those later inventions will be foreclosed by the earlier functional claims. *Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1, 9, 12 (1946). The doctrine condemning functional claims applies to patents for products as well as machines, *see Holland Furniture*, 277 U.S. at 257-58, and to claims that recited "means" for achieving results, *see Halliburton*, 329

U.S. at 8, as well as claims that do not use "means" language, *see General Elec.*, 304 U.S. at 370 (claims recited grains of a particular substance "of such size and contour as to prevent substantial sagging and offsetting").

In response to the *Halliburton* decision, and its general condemnation of functional claiming, Congress amended the patent laws to permit such claiming in limited circumstances only:  where (1) the specification discloses the specific *ways* of performing those functions, and (2) the scope of such claims is limited to those particular *ways* and their equivalents.[10]   The "point of the requirement that the patentee disclose particular structure in the specification and that the scope of the patent claims be limited to that structure is *to avoid pure functional claiming*."  *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).  And where the recited function is performed by a special purpose computer or software program, the structure "must be a specific algorithm disclosed in the specification, rather than merely 'an algorithm executed by a computer.'"  *Id.* at 1331-32; *see also Noah Systems, Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012) (specification must "disclose an algorithm for performing the claimed function") (internal quotation marks and citation omitted).  A specification's failure to disclose the necessary algorithm renders the patent invalid.

The '513 patent seeks to obtain the benefits of purely functional claiming, while attempting to evade the conditions that Congress has placed on its use.  All of the patent's claims recite the desired *result*, or *function*, of intelligently determining upsell items that will likely be purchased.  Indeed, the patent's purported novelty lies in an automated system that determines "upsell" items in an "effective" and "intelligent" manner—*i.e.*, one that "increase[s] the proba-

---

[10] *See* 35 U.S.C. § 112(f) ("An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.").

bility and profitability of commercial transactions." (Col. 12, ll. 45-53.) Had the '513 patent's claims been written in the means-plus-function format that Congress has prescribed for functional claims, those claims would be manifestly invalid under cases such as *Aristocrat Technologies.* The specification states that the function of determining upsell items is made by a "special purpose computer or a general purpose computer program," (col. 20, ll. 24-26), but it discloses no algorithm for performing this function. Instead, the specification states the exact opposite of what the patent laws require, boasting that generic computers may use *any* "decisional systems known to the art," as long as they "*effectuate* the desired *functionalities*." (Col. 20, ll. 27-32 (emphasis added).)

The limitations on functional claiming, however, cannot be defeated by the draftsman's art of converting means-plus-function claims into process steps. The specification's failure to disclose any algorithm or logic for determining upsell items still renders the claims invalid as a matter of law for two reasons.

First, the specification's recitation of a handful of cross-selling examples does not "demonstrate that the [named inventors] actually invented" *any* form of "intelligent," automated cross-selling. The specification states that when a customer "has previously purchased a portion of a set, the completion of the set *may be* a goal." (Col. 24, ll. 25-27 (emphasis added).) When a customer "owns a particular model of computer, that information *may be* utilized in the selection of a proffer, such as in the offer of increased computer memory." (Col. 11, ll. 3-7 (emphasis added).) If a customer has "purchased clothing for use in mountain biking," that customer "*may be more susceptible* to an offer for mountain bike related goods or services." (Col. 24, ll. 21-24 (emphasis added).) Each example is simply an exercise in speculation that a customer *might* purchase an item—*i.e.*, "*may be more susceptible* to an offer." (*Id.*) Such speculation does not

demonstrate that the applicants have actually invented an automatic method of determining "upsell" items in an "effective" and "intelligent" manner that will actually "increase[] the probability and profitability of commercial transactions," (col. 12, ll. 45-53), particularly in light of the specification's warning that upsell techniques do not always work.  (*See*, *e.g.*, Col. 6, ll. 8-16.)

Second, even assuming that any of these examples could qualify as the disclosure of one or more actual "species" of automated, intelligent cross-selling, the disclosure of a handful of such examples most assuredly does not "demonstrate that the applicant[s] ha[ve] made [the] *generic* invention" of automated, intelligent cross-selling in remote commerce sufficient to own all such methods.  *Ariad*, 598 F.3d at 1349 (emphasis added).  Even method claims (which were at issue in *Ariad*, *see id.* at 1340-41), may not "use functional language to define the boundaries of a claimed genus," and thereby "claim a desired result," unless "the applicant has invented species sufficient to support a claim to the functionally-defined genus."  *Id.* at 1349; *see also id.* at 1350 ("merely drawing a fence around the outer limits of a purported genus is not an adequate substitute for . . . showing that one has invented a genus and not just a species.").  The handful of examples in the specification, even if they were sufficient to describe a single way of making or using the claimed invention, would not support the patent's sweeping claims to a functionally-defined genus, because they teach no general method or way that can be used to analyze any other data in order to determine an "upsell."

The specification confirms this.  It states, for example, that the time that a customer contacts the system "may be utilized, such as where a user contacts the system during the nighttime, wherein an upsell more likely to sell to a 'night owl' will be offered as opposed to what is believed to effectively sell to a 'morning person.'"  (Col. 11, ll. 12-19.)  But the specification nowhere explains which among many ways a generic computer *might be instructed* to determine

what products are more appealing to "night owls" than early risers.  Similarly, it states that the number of upsells may be reduced "if it is determined that the customer is unlikely to purchase," or that an offer may be based on a quality factor "where it has been determined or assumed that the customer is interested in a certain level of quality."  (Col. 10, ll. 59-66.)  But again it does not explain *how a generic computer might be instructed* to determine that a customer "is unlikely to purchase" or "is interested in a certain level of quality."  Nor does it explain how a *generic computer should be instructed to analyze* the other numerous data listed in the specification and the claims in order to achieve the desired result of optimizing cross-sales.  *Cf. Ibormeith IP LLC v. Mercedes-Benz, USA*, 732 F.3d 1376, 1381-82 (Fed. Cir. 2013) (specification's failure to "indicate which factors should be used and in what combination and with what relative weights," and its attempt to instead "cover[] all ways of taking into account the listed variables, or some subset of the variables," rendered claims indefinite).  Thus, in the absence of any algorithm, logic, or instructions that can be used to conduct such an analysis, the specification's handful of examples cannot possibly describe a generic invention as opposed to merely "a result that one might achieve if one made that [generic] invention."  *Regents of the Univ. of California v. Eli Lilly and Company*, 119 F.3d 1559, 1568 (Fed. Cir. 1997).  The specification thus "does little more than outlin[e] goals [the inventors] hope the claimed invention achieves," *id.* (internal quotation marks and citation omitted)—*i.e.*, "effective" and "intelligent" selection of items for cross-sale.

## CONCLUSION

For the foregoing reasons, Amazon respectfully submits that the Court should dismiss Tuxis's complaint with prejudice.

*/s/ Tiffany Geyer Lydon*

_____

Steven J. Balick (#2114)
sbalick@ashby-geddes.com
Tiffany Geyer Lydon (#3950)
tlydon@ashby-geddes.com
Andrew C. Mayo (#5207)
amayo@ashby-geddes.com
**ASHBY & GEDDES**
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

Counsel for Defendant
AMAZON.COM, INC.

*Of Counsel*:

William H. Baumgartner, Jr.
wbaumgartner@sidley.com
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, IL 60603
(302) 853-7000

Joseph R. Guerra
jguerra@sidley.com
Michael R. Franzinger
mfranzinger@sidley.com
Kyle T. Deighan
kdeighan@sidley.com
**SIDLEY AUSTIN LLP**
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

January 23, 2014